UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

United States of America,

                against

                                     22-cr-692 (LGS)

Lamor Whitehead,

                Defendant.

------------------------------------------------------- x

Memorandum in Support of Application of Lamor Whitehead for Dismissal or Vacatur of His
Conviction, Disqualification of this District's United States Attorney's Office, Bail Pending
Appeal and/or Resolution of this Application, and Expedited Briefing and Oral Argument

Andrew J. Frisch
Cuti Frisch PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@cutifrisch.com*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

United States of America,

                against

Lamor Whitehead,

                Defendant.

-------------------------------------------------------- x

                       22-cr-692 (LGS)

Memorandum in Support of Application of Lamor Whitehead for Dismissal or Vacatur of His Conviction, Disqualification of this District's United States Attorney's Office, Bail Pending Appeal and/or Resolution of this Application, and Expedited Briefing and Oral Argument

Introduction

This application tees up a thicket of unprecedented issues arising from (1) the President's issuance of Executive Order 14147 (the "Executive Order"), outlawing political "weaponization" of federal prosecutorial power, and announcing "the policy of the United States to identify and take appropriate action to correct past misconduct;" (2) the government's reliance on the Executive Order in seeking dismissal of an indictment against New York City's Mayor Eric Adams; and (3) attendant allegations of misconduct against the same United States Attorney and Assistant United States Attorneys who investigated and prosecuted both Mayor Adams and Lamor Whitehead, Bishop of Leaders of Tomorrow International Ministries.

***Before*** the President issued the Executive Order upon taking Office on January 20, 2025, Bishop Whitehead repeatedly complained that the government had abused its prosecutorial power to create a federal criminal case against him. For example, on March 7, 2024, Bishop Whitehead testified at his trial that, when agents of the Federal Bureau of Investigation first

approached him to execute a search warrant for his cellphones on June 8, 2022, the lead agent

told him:

> Listen, this is not about you.  We don't want you.  We want you to help us get the mayor
> of New York . . . We know that you're close to the mayor, and we want you to help us
> with information . . . . You're making this hard for yourself.  It's not you we want.  We
> want Eric Adams."

Dkt. 293 (Transcript of Mar 7, 2024) at 1117, 1121.

Thereafter, again **before** the President issued the Executive Order, Bishop Whitehead

complained that the government began to make a case against him in April 2022 only after an

informant, Brandon Belmonte, told the government that Bishop Whitehead was a source of

evidence that Mayor Adams was corrupt.  The Court found that the government's investigation

of Bishop Whitehead began only after Belmonte alleged that Bishop Whitehead purportedly

knew that Mayor Adams was corrupt.  *See United States v. Whitehead*, 2023 U.S. Dist. LEXIS

100696 at *2 (S.D.N.Y. June 9, 2023) (finding that the investigation of Bishop Whitehead "began

on or about April 22, 2022" - - when Belmonte first approached the United States Attorney's

Office in this District claiming to have evidence that Mayor Adams was corrupt); *see* Dkt. 254 at

170-71 (the government's handwritten notes of its interview of Belmonte, April 22, 2022,

USAO_00009916-17 (Belmonte claimed that Bishop Whitehead told him that Mayor Adams was

corrupt); Report of Interview of Belmonte, April 22, 2022, USAO_00009914-15.[1]

**Before** the Executive Order and the government's dismissal of its charges against Mayor

Adams, Bishop Whitehead expressly alleged that the government - - *specifically naming*

*prosecutors later cited by the Department of Justice for misconduct in prosecuting Mayor Adams*

---

[1] The report of the government's interview of Belmonte on April 22, 2022, does not appear to
have been docketed on the public record.  It will be filed (or filed under seal) upon conferring
with the government about redactions or any concerns about a public filing.

- - "direct[ed] Belmonte on how to fabricate a case against Whitehead and how to target the Mayor" and "maliciously prosecute[d] Whitehead targeting the Mayor." *See, e.g.,* Motion for Reconsideration of Motions Pursuant to Rules 29 and 33, Jan. 16, 2025 (Dkt. 254), at 16-18, 26 ("Whitehead maintains his innocence.  He remains the 'fall guy' when in fact Mayor Eric Adams was always Dami[e]n Williams' target.").  Bishop Whithead repeatedly complained that the government had engineered and/or unfairly exploited the unavailability of Belmonte as a defense witness though he was expressly named as a victim in Bishop Whitehead's indictment, and though the entirety of the case against Bishop Whitehead began with Belmonte's claim that he was a source of evidence that Mayor Adams was corrupt.

*After* Bishop Whitehead repeatedly called out the government for improperly and unfairly targeting him, the President issued the Executive Order, announcing "the policy of the United States to identify and take appropriate action to correct misconduct by the Federal Government related to the weaponization of law enforcement."  The Office of the Deputy Attorney General (the "ODAG") relied on the Executive Order in obtaining dismissal of the indictment of Mayor Adams.  *See United States v. Eric Adams*, 24-CR-556 (S.D.N.Y.), Dkts. 122, 160, 161, 177.   The ODAG (1) called out Damien Williams, the United States Attorney who indicted Mayor Adams, for pursuing the case for personal political gain [*see Adams*, Dkt. 160 at 2, 15-17; ODAG Letters to Acting United States Attorney Danielle Sassoon, Feb. 10, 2025 (Exhibit A hereto) and Feb. 13, 2025 (Exhibit B hereto); (2) criticized Mr. Williams and his subordinates for a case that was "at best, extremely aggressive" (Exhibit B); (3) alleged that the prosecutors had improperly tailored facts to fit a theory deemed most likely to result in conviction; (4) alleged that the prosecutors had engineered and/or unfairly exploited a key witness's invocation of the privilege against self-incrimination to disadvantage Mayor Adams

[Dkt. 160 at 15]; and (5) otherwise rebuked the prosecutors for targeting Mayor Adams as someone Mr. Williams thought "he should get, rather than [someone who] need[ed] to be prosecuted." *See* Exhibit B (quoting *See Morrison v. Olson*, 487 U.S. 654, 728, 801 (1988) (Scalia, J., dissenting) (quoting Robert Jackson, *The Federal Prosecutor,* Address Delivered at the Second Annual Conference of United States Attorneys, Apr. 1, 1940).

Reactions to the Executive Order and the Department of Justice's dismissal against Mayor Adams have been vociferous for multiple and sometimes competing reasons. To supporters of the President and his agenda, the Executive Order vindicated their allegiance to their leader and cause. To some observers of the federal courts, including supporters of the prosecutors rebuked by the ODAG, it was the Executive Order and the consequent dismissal against Mayor Adams which were political - - apparent gambits of the President to deflect opprobrium for his own misdeeds and otherwise pressure Mayor Adams to support the President's use of immigration to camouflage an authoritarian takeover of the United States. To other observers of the federal courts, the Executive Order conflated the President's idiosyncratic grievances with longstanding prosecutorial excess too often afforded undue deference.

These various views must yield in Bishop Whitehead's case to the newly-announced policy of the United States, application of that policy to the same investigation which produced the charges against both Mayor Adams and Bishop Whitehead, and allegations of prosecutorial misconduct based on newly-discovered facts. Equal justice and public confidence in the courts would be undermined if the Executive Order's reach were limited to people like Mayor Adams, a public official with power to animate the Executive's political agenda. Even if the Executive Order itself permits relief only to supporters of the President or his agenda as he deems appropriate, the new developments and facts on which this motion is based provide definitive

and new support for Bishop Whitehead's previously-made challenges to the constitutional unfairness of the case against him, the unavailability of his alleged victim to testify as a defense witness, and the government's "at best, extremely aggressive" and shifting theories to obtain a conviction. On the circumstances of this case, the government should not be permitted to hold a conviction aloft like a golden idol and shelter it from the morass below.

This motion is submitted pursuant to Federal Rule of Appellate Procedure 12.1(a), which authorizes review by a district court while a defendant's direct appeal is pending. *See* Rule 12.1(a) (a district court may state "either that it would grant the motion or that the motion raises a substantial issue" if a pending appeal serves to deny it authority to rule). It seeks disqualification of this United States Attorney's Office because of a potpourri of actual and potential conflicts of interest. And it seeks dismissal of the case against Bishop Whitehead or, alternatively, vacatur of his conviction.

This motion also seeks an expeditious hearing on Bishop Whitehead's motion for bond and his release until the distinctly substantial issues raised herein are resolved to relieve him from continued unjust custody. It seeks expedited briefing and oral argument on the other parts of his application.

### A.    *Procedural History*

On December 19, 2022, a four-count indictment against Bishop Whitehead was unsealed (Dkt. 2), charging him with attempted wire fraud against Belmonte; attempted extortion of Belmonte; making a false statement to agents executing the first of multiple search warrants against Bishop Whitehead based on probable cause developed through Belmonte, and wire fraud based on an allegation of Brooklyn resident Pauline Anderson in a pending civil lawsuit in Kings

County Supreme Court that she was defrauded out of $90,000, which the government federalized when it decided to prosecute Bishop Whitehead upon investigating Belmonte's information.  On March 7, 2023, a superseding indictment was filed (Dkt. 63) adding a fifth count, charging wire fraud based on an attempted transaction unrelated to the other counts, about which the government apparently first learned during execution of one of its search warrants based on probable cause developed through Belmonte.

Bishop Whitehead was tried before the Honorable Lorna G. Schofield and a jury in March 2024 and convicted of all counts.  Dkt. 180.  He was sentenced principally to a term of imprisonment of 108 months (Dkt. 232), restitution of $85,000 to Ms. Anderson (Dkt. 231) and total forfeiture of $95,000.  Dkt. 230.  The restitution and forfeiture were apparently both principally based on the fraud against Ms. Anderson.

Bishop Whitehead's direct appeal has been fully briefed but not yet scheduled for oral argument.  *See* Second Circuit Case No. 24-1769.  Bishop Whitehead argues on appeal, among other things, that the district court erred in permitting Belmonte improperly to invoke his right against self-incrimination, thereby preventing Bishop Whitehead from calling him as a witness in Bishop Whitehead's defense.  *See* Whitehead Appellate Brief (Second Circuit Dkt. 70) at 22; Whitehead Appellate Reply Brief (Second Circuit Dkt. 96) at 1.  On September 18, 2024 (four months before issuance of the Executive Order and subsequent dismissal against Mayor Adams), the Second Circuit denied Bishop Whitehead's application for bail pending appeal.  Second Circuit Dkt. 34.[2]

---

[2] The parties' appellate briefs and submissions on Bishop Whitehead's application for bond pending appeal are hereby incorporated by reference as if fully set forth herein.

B.    *The Government's Dismissal Against Mayor Adams*

On February 10, 2025, the ODAG directed Acting United States Attorney Danielle

Sassoon to dismiss a then-pending indictment against Mayor Adams and to cease "targeting" him

or taking any additional investigative steps prior to review of the case by the confirmed United

States Attorney, after the mayoral election in November 2025.  Exhibit A.  On February 12,

2025, Ms. Sassoon offered to resign if the Attorney General declined to reconsider the ODAG's

directive and thereafter tendered her resignation, which the ODAG accepted.  Exhibit B.

In the ODAG's initial letter to Ms. Sassoon and subsequent correspondence and filings,

the ODAG cited three principal reasons for the directed dismissal of the indictment against

Mayor Adams.  ***First***, the ODAG suggested that the charges against Mayor Adams represented

"a politically motivated prosecution."  Exhibit B.  The ODAG rebuked Mr. Williams for

"apparent political aspirations" in investigating and prosecuting Mayor Adams and for launching

a personal website after stepping down as United States Attorney that "closely resembled a

campaign website."  The website touted articles about the prosecution of Mayor Adams and his

"broken ethical compass" and Mr. Williams as a prosecutor of "kings."  The ODAG said that the

actions of Mr. Williams "inappropriately politicized and tainted [the United States Attorney's

Office's] prosecution, potentially permanently."  Exhibit B.  As the ODAG subsequently put it,

"[t]he appearances of impropriety are too great based on the conduct of the former U.S. Attorney

[Mr. Williams] who initiated the case . . . ."  Dkt. 160 at 1.

The ODAG supported its conclusion of irreparable taint with comments of Ms. Sassoon

(who became Acting United States Attorney when Mr. Williams resigned) and former

subordinates of Mr. Williams assigned to prosecute Mayor Adams (and Bishop Whitehead).  The

ODAG cited comments of Ms. Sassoon that she was "personally disappointed in [her] predecessor's self-serving actions after his departure." Dkt. 160 at 1-2. The ODAG also cited AUSA Hagan Scotten's sentiments that (1) Mr. Williams "obviously has political ambitions, and I think suggesting we doubt that just costs us credibility;" (2) it was "pretty plausible" that Mr. Williams "had a political motive" in prosecuting Mayor Adams; and (3) he hoped to "distance" the prosecution team [the same team that investigated Bishop Whitehead] from Mr. Williams "enough that [Judge] Ho [to whom the case against Mayor Adams had been assigned] and [President] Trump will know we don't approve of what he did, but no so much that we magnify the scandal." Dkt. 160 at 2. The ODAG otherwise quoted internal exchanges among assistants acknowledging at least the plausibility that Mr. Williams targeted Mayor Adams based on "obvious[]" political ambitions. Dkt. 160 at 14-15.

**Second**, the ODAG alleged misconduct of prosecutors in indicting Mayor Adams and determined that the United States Attorney's office had "demonstrated itself to be incapable of fairly and impartially reviewing the circumstances of this case," which it transferred to the Department of Justice's main office. The ODAG described the case against Mayor Adams as turning on factual and legal theories that were "at best, extremely aggressive." Exhibit B.

For example, the ODAG cited a text message from AUSA Scotten to AUSA Derek Wikstrom dated July 18, 2024, suggesting the government's exploitation and/or engineering of a key witness's invocation of his privilege against self-incrimination: "Letting [the witness] come in and refuse cross just hurts us. An invocation is better." *See Adams*, Dkt. 160 at 15 (AUSA Scotten's text posted to the docket of the Mayor's case at Dkt. 175-5 at 2).

Another text message sent by AUSA Celia Cohen, dated September 5, 2024 (less than three weeks before filing of the indictment of Mayor Adams on September 24, 2024), suggested

manipulation of facts to enhance the prosecution's chances of conviction: "[W]e did a lot of gymnastics around the influence point" in investigating Mayor Adams, suggesting that "maybe making him the one exploiting the corrupt relationship works better." *See Adams*, Dkt. 160 at 15; Dkt. 175-6 at 2.

The ODAG put two of the AUSA's principally responsible for the case, AUSA's Scotten and Wikstrom, on administrative leave pending investigations by the Office of the Attorney General and the Office of Professional Responsibility, and later also put AUSA's Cohen and Andrew Rohrback on administrative leave. All four of these prosecutors (all of whom participated in prosecuting Bishop Whitehead [*see* docket entries dated December 19, 2022 (appearances of AUSA's Scotten, Cohen, and Rohrback) and July 18, 2023 (appearance of AUSA Wikstrom)] subsequently resigned from the Department of Justice.

***Third***, the ODAG cited the indictment's impact on the ability of Mayor Adams to devote full attention and resources to the President's "immigration objectives." Exhibit A.

C.    *The Prosecution of Bishop Whitehead Was Irreparably Tainted by the Same Misconduct Cited by the ODAG in Dismissing Against Mayor Adams*

The case against Bishop Whitehead was investigated by the same prosecutors who investigated Mayor Adams as part of the same investigation. Bishop Whitehead was indicted by the same United States Attorney (Mr. Williams) called out by the ODAG for political motivations. Like the prosecution of Mayor Adams, the case against Bishop Whitehead was "at best, extremely aggressive" and featured the same prosecutorial machinations cited by the ODAG in dismissing against Mayor Adams, as explained below.

The Court should not sanction selective exercise of executive discretion in favor of a purported supporter of the President's agenda and deny it to Bishop Whitehead when the same

infirmities taint both cases.  Nor should the Court validate any effort by subordinate prosecutors to use this motion to chip away at concerns about prosecutorial misconduct from senior officials of the Department of Justice.

1.   *The government targeted Bishop Whitehead to get Mayor Adams*

Belmonte (apparently without the assistance of an attorney) contacted this District's United States Attorney's Office on April 22, 2022, claiming that Bishop Whitehead was a source of evidence that Mayor Adams was corrupt.  Almost immediately, Belmonte was put in touch with and spoke telephonically with AUSA's Scotten and Cohen and special agents of the Federal Bureau of Investigation ("FBI").  The prosecution team apparently deemed Belmonte's proffered information about Mayor Adams sufficiently urgent that it spoke with him for over an hour late in the evening of April 22, 2022, and agents visited him at his home early the next morning, explaining, "This is really serious."  WWPR-FM (Power 105.1), July 23, 2023, *"Brandon Belmonte Clears the Air on Alleged False Claims by Bishop Lamor Whitehead,"* at 8:44 to 10:14 ("Power 105.1 Interview") (available on YouTube).

The prosecution team knew or should have known that Belmonte's information was unreliable.  As of April 22, 2022, Belmonte had been arrested at least six times [*see United States v. Belmonte*, 23-CR-313 (E.D.N.Y.) (Cogan, U.S.D.J.) ("*Belmonte*"), Dkt. 11 at 2 (providing discovery of Belmonte's criminal history consisting of seventeen pages)]; had been civilly sued about a dozen times resulting in multiple adverse judgments; and had already been in contact with the FBI for years:  the government's discovery in a subsequent criminal case against Belmonte in the Eastern District of New York included notes associated with six interviews of Belmonte and two text exchanges with agents between 2013 to 2021, and notes associated with an additional interview on March 28, 2022, less than a month *before* Belmonte reached out to the

FBI about Mayor Adams and Bishop Whitehead. *See Belmonte*, Dkt. 16 at 9-10, Dkt. 254 at 88-89; see also Dkt. 254 at 200, 220-21, 227, 234-35, 239, 241 (an investigator's report about Belmonte including evidence of his various boasts about his connections to the FBI).

On August 1, 2023, the Eastern District indicted Belmonte for two separate frauds committed between January 2019 and December 2021. *See Belmonte,* at Dkts. 1, 44-46. Belmonte pled guilty in satisfaction of the indictment on July 11, 2025 (after at least ten exclusions of time under the Speedy Trial Act). Thus, on April 22, 2022, the government knew of Belmonte's criminal past and knew or should have known that he had been committing the crimes for which he was indicted in 2023 after he first met with the FBI in 2013 and while he was continued to meet with the FBI.

According to an agent's interview report and the agent's associated handwritten notes, Belmonte on April 22, 2022, claimed that Bishop Whitehead had asked Belmonte to sell him a residential building under construction in the Bronx (purportedly owned by Belmonte or his father) "due to WHITEHEAD's close relationship with New York City Mayor Eric Adams." USAO_00009914 at 1.[3] Belmonte claimed that, a week before April 22, 2022, Mayor Adams had told Belmonte via FaceTime that he should do business with Bishop Whitehead:

> Approximately one week ago, WHITEHEAD visited BELMONTE's [auto repair business] and again engaged with BELMONTE about the desired real estate deal. WHITEHEAD claimed he would FaceTime with ADAMS. WHITEHEAD then called ADAMS via FaceTime. ADAMS told BELMONTE [that] WHITEHEAD engaged in big things in real estate, they [ADAMS, WHITEHEAD, and BELMONTE] should all meet up, and BELMONTE should do business with WHITEHEAD. Following the FaceTime with ADAMS, WHITEHEAD told BELMONTE to sell WHITEHEAD the building, so he could receive city government money by transferring the building into affordable

---

[3] As noted above, the report of the government's interview of Belmonte on April 22, 2022, does not appear to have been docketed on the public record. It will be filed (or filed under seal) upon conferring with the government about redactions or any concerns about a public filing.

housing or a homeless shelter, then sell the apartments on the open market at regular market value.

USAO_00009914-5 at 1-2.  According to the agent's associated handwritten note,

> EA stated LW doing big real estate things, all should meet up
> on FT week ago     Should do biz w/LW.

USAO_00009917 available at Dkt. 254 at 170-71.

Belmonte's claim to the government that he had witnessed and/or participated in a FaceTime (or any other type of call) with Mayor Adams was a lie, which appears indisputable from at least the following four facts.  *First*, when agents visited Belmonte at his home the morning after the telephone call between Belmonte and the government, they directed him to begin recording multiple conversations with Bishop Whitehead, none of which mentioned or confirmed that Belmonte had ever spoken to or overheard any conversations with Mayor Adams who was a focus of the government's investigation.  *Second*, beginning on June 7, 2022, the government relied on Belmonte's recorded conversations with Bishop Whitehead to apply for a search warrant but targeting Mayor Adams, which made no mention of Belmonte's purported call with Mayor Adams and Bishop Whitehead and, instead, suggested Belmonte's efforts to precipitate such a call.  *See, e.g.*, Dkt. 254 at 173 (application for a search warrant, June 7, 2022 (recounting that Belmonte asked whether "they could sit down" with Mayor Adams).  *Third*, the government never corroborated the fact of any such call from any telephone records.  *Fourth*, Belmonte later acknowledged that in fact he had never spoken to Mayor Adams:  "[Bishop Whitehead] called Eric Adams right in front of me.  Eric Adams did not pick up the call in any of the conversations ever."  Power 105.1 Interview" at 12:03 to 12:11.

In addition, the application misrepresented an alleged fact supporting proffered probable cause of "extortion under color of official right, conspiracy to commit extortion under color of

official right, and aiding and abetting extortion under color of official right." Dkt. 254 at 175
Application of June 7, 2022, quoting the language of 18 U.S.C. §§ 1951 and 2). The application
alleged that, on May 5, 2022, FBI agents recorded a FaceTime conversation in which Bishop
Whitehead allegedly displayed a call log on a cell phone showing calls between Bishop
Whitehead and Belmonte [Dkt. 254 at 180-81], but (as the government later conceded, *see* Dkt.
166 at 38-40), Belmonte recorded the alleged conversation on his own cellphone and
inexplicably did not provide it to agents until May 24, 2022. *See* Dkts. 127 and 182 at 8. The
application contained no other allegation suggesting any direct contact between Bishop
Whitehead and Mayor Adams in support of probable cause of extortion under color of right
except a later return call from the Mayor's scheduler. *See* Dkt. 254 at 183.

Six of the nine categories of information sought (and later authorized) to be seized
expressly referred to one or more unnamed New York government officials or their staffs. A
subsequent application for a search warrant recounted Bishop Whitehead's alleged conversations
about connections to Mayor Adams again identifying six categories of evidence to be seized
expressly referring to one or more unnamed New York government officials or their staffs. *See*
Dkt. 254 at 195.

Meanwhile, the focus of AUSA's Scotten and Cohen remained Mayor Adams as the
investigation continued. For example, according to an interview report of meeting with
Belmonte on May 5, 2022,

> [A]USA Scotten proposed a way forward suggesting that at the next meeting between
> BELMONTE and WHITEHEAD, BELMONTE ask WHITEHEAD to ask ADAMS to lift
> the stop work order that currently exists on the Villa Ave [Bronx] property. He also
> suggested he ask WHITEHEAD to elaborate how exactly they can benefit and make
> money with the real estate projects they bring ADAMS as mayor.

Dkt. 254 at 166.

The government's investigation of Mayor Adams through Bishop Whitehead established no direct evidence that Mayor Adams was in fact corrupt, only the government's allegation that Bishop Whitehead touted his relationship with Mayor Adams in Belmonte's recorded conversations.

   2.   *The prosecution of Bishop Whitehead was tainted by the United States Attorney's political motivation and the types of misconduct cited by the ODAG*

Whether Mr. Williams had a chessboard in mind when he fancied himself as a prosecutor of "kings" [Exhibit B], he targeted a bishop metaphorically and actually close to one of his targeted kings, Mayor Adams. *See* Whitehead Presentence Report at ¶¶ 122-27 (describing Bishop Whitehead's pastoral position and background). On a chessboard, there is no intervening space between a king and a bishop; nor here. Mr. Williams "inappropriately politicized and tainted [the United States Attorney's Office's] prosecution," creating "appearances of impropriety [that] are too great based on the conduct of the former U.S. Attorney [Mr. Williams] who initiated the case. " Dkt 160 at 3. Even subordinates of Mr. Williams, who dissented from dismissal against Mayor Adams, acknowledged that the political ambitions of Mr. Williams were "obvious," plausib[le]," and worthy of rebuke, and that his pursuit of Mayor Adams may well have been politically motivated. *See* Dkt. 160 at 15-17. That taint alone entitles Bishop Whitehead to relief.

More, Bishop Whitehead was tainted by the same types of misconduct called out by the ODAG in dismissing against Mayor Adams, and in at least three separate and significant ways. ***First***, as noted above, the ODAG cited a text message from AUSA Scotten to AUSA Wikstrom suggesting the government's exploitation and/or engineering of a key witness's invocation of his privilege against self-incrimination: "Letting [the witness] come in and refuse cross just hurts us. An invocation is better." Dkt. 160 at 15; Dkt. 175-5 at 2.

This type of contrivance unduly prejudiced Bishop Whitehead's.  As noted above, the investigation of Bishop Whitehead began on about April 22, 2022, when Belmonte contacted this District's United States Attorney's Office and claimed that Bishop Whitehead had evidence that Mayor Adams was corrupt.  Eight months later, on December 19, 2022, the government's initial indictment against Bishop Whitehead was unsealed, and a superseding indictment was announced on March 7, 2023.  On July 17, 2023, Judge Schofield ordered Bishop Whitehead's trial to begin on February 26, 2024.  Dkt. 95.

By the time of Judge Schofield's scheduling order of July 17, 2023, fifteen months had passed since April 2022, when Belmonte first contacted the government with information that Mayor Adams was corrupt.  But it was not until August 1, 2023, less than two weeks after Judge Schofield scheduled Bishop Whitehead's trial, that the Eastern District filed a two-count indictment against Belmonte, charging him with conspiracies to commit wire and bank fraud related to his vehicle financing business between 2019 and 2021.  *See United States v. Belmonte*, 1:23-cr-00313 (E.D.N.Y.), Dkt. 1.  Between the dates of Belmonte's indictment in August 2023 and his guilty plea in July 2025, the government and Belmonte consented to at least ten orders of excludable delay under the Speedy Trial Act, an atypically high number not plausibly and solely explained by negotiations toward a disposition or unforeseen exigencies.

Of the five counts against Bishop Whitehead, two named Belmonte as a victim (Count Two alleged attempted wire fraud and Count Three alleged attempted extortion); two were fruits of the search warrants obtained based on probable cause developed through Belmonte (Count Four alleged a false statement during execution of a search warrant and Count Five alleged a fraud apparently discovered from evidence seized pursuant to a search warrant); and Count One was based on an alleged fraud that was the subject of a civil lawsuit seeking $90,000 that was

pending in Kings County Supreme Court when Mr. Williams decided to indict Bishop Whitehead and make a federal case against him.

At trial, Bishop Whitehead sought to call Belmonte as a defense witness to challenge the authenticity of the recorded conversations in which the government's case was significantly based and to establish exculpating contexts for Bishop Whitehead's allegedly inculpating statements in the recordings, but Belmonte invoked his rights under the Fifth Amendment. Outside the presence of the jury, Belmonte invoked his rights under the Fifth Amendment twenty-three times, not necessarily to questions implicating the then-pending charges against him in the Eastern District [*see* Dkt. 189 at 520-24], but as to *any* question related to his interactions with Bishop Whitehead:

> Q.  Mr. Belmonte, with respect to your interactions with Lamor Whitehead, are there any substantive questions to which you would not invoke your Fifth Amendment rights?
> A.  No, ma'am.

Dkt. 189 at 524.

Belmonte also refused to answer any questions about whether the investigation of Bishop Whitehead was commenced to gain evidence against Mayor Adams.  Thus, Belmonte refused to answer questions including whether he told the FBI that Mayor Adams had told him to do business with Bishop Whitehead; to identify the true target of the government's investigation (Mayor Adams); and whether Bishop Whitehead had been caught in a sting operation targeting Mayor Adams.  *See* Dkt. 189 at 520-24.

As Bishop Whitehead argues in his pending appeal, Belmonte had no valid basis to invoke the Fifth Amendment based on "matters in which he had acted in an undercover capacity for the government" unrelated to the charges pending against Belmonte in the Eastern District.

*See United States v. Zappola*, 646 F.2d 48, 52 (2d Cir. 1981) (cited in Bishop Whitehead's Brief on Appeal at 24, 26).   AUSA Scotten's text to AUSA Wikstrom constitutes new evidence and adds to the arguments made by Bishop Whitehead in this Court and on appeal.  If prosecutorial contrivance of Belmonte's invocation is not a fair inference from AUSA Scotten's text addressing a witness against Mayor Adams in the same overarching investigation, the Court should convene a fact-finding hearing at which at least AUSA's Scotten and Wikstrom and the AUSA's who tried the case against Bishop Whitehead should be required to testify under oath to address the coincidental timing of the charges against Belmonte and his consequent invocation. They should not be permitted to answer this question in a brief nor in a studiously word-smithed written submission; they should be subject to cross-examination.

**Second**, as noted above, a test message sent by AUSA Cohen, a member of the team prosecuting Mayor Adams (and Bishop Whitehead), suggested manipulation of the facts to make it seem that Mayor Adams was exploiting a corrupt relationship to enhance the prosecution's chances of conviction:  "[W]e did a lot of gymnastics around the influence point" in investigating Mayor Adams, suggesting that "maybe making him the one exploiting the corrupt relationship works better."  Dkt. 175-6 at 2.  So here.  After using Belmonte's information to investigate Mayor Adams through Bishop Whitehead, the government pivoted to an investigation of Bishop Whitehead for falsely promising "favorable actions by the New York City government" which he "knew that he had no ability to obtain such actions."  *See* Superseding Indictment (Dkt. 63) at ¶ 4.  By the time of the government's pivot, however, its investigation was already irreparably tainted by the improper motivations of the United States Attorney in targeting Mayor Adams called out by the ODAG - - and the United States Attorney's attendant improper motivations in adding a bishop to his roster of kings.

*Third*, decisions of Mr. Williams in prosecuting Bishop Whitehead otherwise establish that Bishop Whitehead, like Mayor Adams, was targeted as someone Mr. Williams thought "he should get, rather than [someone who] need[ed] to be prosecuted." Thus, for example, Mr. Williams indicted Bishop Whitehead in Count Four for violating 18 U.S.C. § 1001 by falsely telling FBI agents that he owned only the cellphone he was then carrying, not also a second cellphone. *See* Superseding Indictment (Dkt. 63) at ¶ 14. But if vindication of truth-telling to federal law enforcement was truly his motivation in charging Bishop Whitehead, he would have charged Belmonte with falsely telling AUSA's Scotten and Cohen and FBI agents that Mayor Adams had spoken to Belmonte during a FaceTime and told him to do business with Bishop Whitehead. Despite the gravity of a statement falsely implicating a public official and Belmonte's attendant robust record of dishonesty, Mr. Williams took no action against him.

Similarly, Mr. Williams made a federal case out of Ms. Anderson's pending lawsuit against Bishop Whitehead in Kings County Supreme Court even though her lawsuit was the subject of her pending motion for a default judgment, and even though the amount at issue, $90,000, was pocket change compared to financial frauds typically prosecuted in this District. Thus, on September 19, 2022, four days before Ms. Anderson's motion for a default judgment was filed, she was first interviewed by AUSA Rohrbach. *See* Whitehead GX 3503-006 (Interview of Ms. Anderson)[4]. Nothing in the report of the government's interview of Ms. Anderson suggested her dissatisfaction with the progress of her case in state court and, in fact, she moved in state court for a default judgment and related relief four days after the interview. *See* NYSCEF Dkt. 34. Three months later, on December 15, 2022, Mr. Williams indicted Bishop

---

[4] The report of the government's interview of Ms. Anderson does not appear to have been docketed on the public record. It will be filed (or filed under seal) upon conferring with the government about redactions or any concerns about a public filing.

Whitehead, charging him in this District with fraud based on Ms. Anderson's allegations in her pending Kings County civil suit.  Even after the indictment was announced, motion practice in state court continued.  *See* NYSCEF Dkt 73.

More, even though Brooklyn resident Ms. Anderson had predicated venue for her civil case in Kings County Supreme Court, and despite the absence of any truly substantial connection of her claimed fraud to this District, Mr. Williams justified venue in this District on communications via text and telephone with Ms. Anderson's son when he was in Manhattan.  *See* Dkt. 233 Opinion & Order, June 21, 2024), at 6.  Similarly, the government justified venue in this District for Bishop Whitehead's allegedly false statement about whether he owned one or two cellphones because "Manhattan-based agents and prosecutors had to obtain a second search warrant to seize the phone that was not recovered in the first search."  *Id.* at 14.  Even assuming true federal interest in either crime, neither charged crime was truly committed in this District.

3.  *The Court Rejected Bishop Whitehead's Challenge to the Fairness of the Investigation and Did Not Permit Him to Press that Challenge to the Jury*

As demonstrated above, Bishop Whitehead by this motion is not jumping on the bandwagon of the Executive Order and consequent dismissal against Mayor Adams, but argued during the pendency of his case that he was unfairly targeted in the government's pursuit of Mayor Adams.  Bishop Whitehead could not then cite to the not-yet-issued Executive Order nor rely on the consequent dismissal against Mayor Adams and its bases, and so his efforts at fair justice were stymied.  In fact, the prosecutors successfully moved *in limine* to preclude Bishop Whitehead "from suggesting any impropriety by the Government or the FBI in its investigation and prosecution of the defendant," including "challenging the motives of an investigation or prosecution."  *See* Dkt. 129-1 at 1-3 ("the upcoming trial is not a platform for the defendant to air

out grievances about certain agents, about the investigation as a whole, or about law enforcement.").

In granting the government's motion *in limine*, the Court ruled that claims of prosecutorial misconduct are properly addressed in pretrial motions.  Dkt. 150.  But the Executive Order and the bases for the dismissal against Mayor Adams were not known to Bishop Whitehead until issuance of the Executive Order, which was retrospective, announcing "the policy of the United States to identify and take appropriate action to correct past misconduct." That policy applies here, as it applied to Mayor Adams.  Whether or not the Department of Justice seeks to dismiss this case pursuant to F. R. Cr. P. 48(a), the Court has the power to consider the misconduct underlying the dismissal against Mayor Adams and dismiss against Bishop Whitehead or vacate his conviction.

### D.    The United States Attorney's Office Should Be Disqualified

This application raises special circumstances establishing that the interests of justice can only be advanced if the entire Office of this District's United States Attorney is disqualified.  *See United States v. Basciano*, 763 F. Supp. 2d 303, 314 (E.D.N.Y. 2011), *aff'd*, 634 F. App'x 832 (2d Cir. 2015) (a District Judge "retains broad discretion in deciding a motion to disqualify."); *McLenton v. Menifee*, No. 05 CV 2844 (JGK), 2006 WL 2517002 at *1 (S.D.N.Y. Aug. 29, 2006) *(citing Cheng v. GAF Corp.*, 631 F.2d 1052, 1055 (2d Cir. 1980) (collecting cases), *vacated on other grounds*, 450 U.S. 903 (1981)).  Disqualification of a United States Attorney's Office requires a showing of prejudice if not actual bad faith or misconduct [*see United States v. Ramirez*, No. 03 CR 1079 (Judge Kram), 2004 WL 203034, at *3 (S.D.N.Y. Feb. 2, 2004)], which has been made here and renders any other remedy insufficient.

In dismissing against Mayor Adams, the ODAG determined that the United States Attorney's office had "demonstrated itself to be incapable of fairly and impartially reviewing the circumstances of this case," which it transferred to the Department of Justice's main office.  The ODAG said that the investigation of Mayor Adams was politically motivated and concluded that Mr. Williams "inappropriately politicized and tainted [the United States Attorney's Office's] prosecution, potentially permanently."  As the ODAG subsequently put it, "[t]he appearances of impropriety are too great based on the conduct of the former U.S. Attorney [Mr. Williams] who initiated the case . . . ."  Dkt. 160 at 1.  Assistant United States Attorneys who worked on the case acknowledged the political ambitions and motives of Mr. Williams.  Bishop Whitehead, known to be friendly with Mayor Adams, was targeted by the same United States Attorney and the same Assistant United States Attorneysas part of the same investigation.  The appearance of impropriety in permitting the Office to continue to represent the government here is no less great than against Mayor Adams.

More, the prosecutors in the eye of the storm include Mr. Williams and Ms. Sassoon, respectively leaders of the Office during the relevant events.  The aspersions cast by the ODAG on Mr. Williams and the later resignation of Ms. Sassoon following her dissent from the ODAG's conclusions constitute circumstances that are highly atypical and special.  All or substantially all of the Office's current assistants worked for Mr. Williams, Ms. Sassoon, or both of them, and were colleagues and possibly friendly with them and the four Assistant United States Attorneys who resigned.  The various conflicts of personal and professional interests jeopardize the interests of and appearance of justice.  *See* New York Rule of Professional Conduct 1.7 (a lawyer shall not represent a client if the representation will be materially limited by a personal interest).

In addition, part of the misconduct cited by the ODAG in dismissing against Mayor Adams was AUSA Cohen's text that she and her colleagues "did a lot of gymnastics around the influence point and maybe making him the one exploiting the corrupt relationship works better." *See* Dkt. 175-6 at 2. AUSA Cohen's text responded to a text from AUSA Scotten which apparently referred to substantive input from "Rob" and "Lara" [*id.*], apparent references to AUSA's Robert Sobelman and Lara Pomerantz, co-chairs of the United States Attorney's Public Corruption Unit. While no misconduct has been claimed against AUSA's Sobelman or Pomerantz, they may be witnesses to the circumstances of Ms. Cohen's text if not the broader circumstances of the investigation of Bishop Whitehead challenged by this motion. The AUSA's who prosecuted Bishop at trial, AUSA's Jessica Greenwood and Jane Kim, are also potential witnesses. *See* New York Rule of Conduct 3.7 (a lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact).

This case does not raise a typical claim of misconduct to which the relevant prosecutor may properly respond, but claims deemed so pervasive about the Office under the stewardship of Mr. Williams (and Ms. Sassoon) that the government dismissed against the city's highest ranking public official. The risk is too great that members of the Public Corruption Unit - - as well as the entire Office  - -  may feel (or appear) compelled to advocate in favor of their and the Office's defense of previously-made decisions and, as stated by the ODAG, may "be incapable of fairly and impartially reviewing the circumstances of this case."[5]

---

[5]   The Court has discretion to cause this application to be randomly reassigned to another Judge as it previously ruled on issues raised herein. *See United States v. Sterkaj*, 138 F.4th 95, 103 (2d Cir. 2025); *United States v. Wilson*, 920 F.3d 155, 168 (2d Cir. 2019).

*E.  This Case Presents a "Substantial Issue" Within the Meaning of F. R. A. P. 12.1(a)*

Rule 12.1(a) of the Federal Rules of Appellate Procedure authorizes the Court to state either that it would grant this motion or that the motion raises a substantial issue, even though the Court lacks authority to grant the motion because Bishop Whitehead's appeal has been docketed and is pending.  *See United States v. Cronic*, 466 U.S. 648, 667 n. 42 (1984).  The Court should state that it would grant this motion or at least state that it raises a substantial issue.  While the issues raised are "substantial" within even the most circumscribed definition of the word, the issues by analogy are certainly substantial within the meaning of 18 U.S.C. § 3143(b)(1)(B); *see United States v. Randell*, 761 F.2d 122 (2d Cir. 1985).

*F.      Bishop Whitehead is Entitled to Relief*

The unprecedented and unusual circumstances of this case entitle Bishop Whitehead to relief under any of a number of vehicles.  A writ of habeas corpus pursuant to 28 U.S.C. § 2255 may issue under exceptional circumstances or to remedy a fundamental defect that results in a miscarriage of justice, as here improper prosecutorial purpose and tactics in violation of the constitutional guarantees of due process and fundamental fairness.  *See, e.g., Davis v. United States*, 417 U.S. 333, 346-347 (1974); *Bousley v. United States*, 523 U.S. 614, 626 (1998); *Graziano v. United States*, 83 F.3d 587, 589-90 (2d Cir. 1996 (per curiam) (quoting *United States v. Bokun*, 75 F.3d 8, 12 (2d Cir. 1995); *see also United States v. Azeem*, 946 F.2d 13, 15 (2d Cir. 1991).

Further, a writ of coram nobis may issue to correct errors which "escaped attention," which were "material to the proceeding" [*Bronson v. Schulten*, 104 U.S. 410, 416 (1881)], or which affect the "validity and regularity" of the judgment.  *United States v. Morgan*, 346 U.S.

502, 507, 511 (1954) (the writ lies under circumstances compelling such action to achieve

justice"); *United States v. du Purton*, 891 F.3d 437 (2d Cir. 2018).  Coram nobis "can issue to

redress a fundamental error," including "a legal or factual error.  *United States v. Denedo*, 556

U.S. 904 (2009).

Bishop Whitehead is also entitled to relief under F. R. Cr. P. 33 as the misconduct on

which the the indictment against Mayor Adams was dismissed constitutes newly discovered

evidence.  *See United States v. Forbes*, 790 F.3d 402 (2d Cir. 2015).  The new evidence was not

known nor could have been discovered earlier, it is material and not merely cumulative or

impeaching, and establishes that the case was tainted by improper prosecutorial motive and

tactics.

While F. R. Cr. P. 48(a) vests discretion to dismiss in the executive, it does not

incapacitate the judiciary from considering the underlying rationale of a dismissal and its

application to another defendant and fashioning appropriate relief.  Likewise, while the executive

branch has the authority to implement an executive order, the judiciary is not incapacitated from

considering the expressed policy of the United States and its application by the government in

one case to address claims of misconduct that are present in another case to achieve actual and

apparent fair and equal justice.

It now stands conceded by the most senior officials of the Department of Justice that the

reality or appearance of political motivation in prosecuting Mayor Adams - - and/or attendant

prosecutorial excess in laying the groundwork for conviction - - was so great as to require

dismissal with prejudice.  There is no genuine space between Mayor Adams and Bishop

Whitehead; the case against Bishop Whitehead is likewise irreparably tainted for the same

reasons.  Members of the United States Attorney's Office and others may disagree with the

ODAG's government's actions in favor Mayor Adams, but litigants (especially defendants)

often disagree with actions in favor of the government.  The Executive Order, the consequent

dismissal against Mayor Adams, and the reasons therefor, effectively constitute new law and

newly-discovered evidence.  At the very least, Bishop Whitehead's preexisting expressed

challenges to this case should be reconsidered in the context of the new developments and, upon,

reconsideration, dismissed.  *See In re Aiken County,* 725 F.3d 255, 264 n. 7 (D.C. Cir. 2013) ("If

the Executive selectively prosecutes someone based on impermissible considerations, the equal

protection remedy is to dismiss the prosecution, not to compel the Executive to bring another

prosecution."); *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979) (dismissal is

appropriate in the limited and extreme circumstance where "there was a need either to eliminate

prejudice to a defendant in a criminal prosecution, where it was impossible to do so by

imposition of lesser sanctions"); *Hill v. United States*, 368 U.S. 424, 428 (1962) (Section 2255

may remedy "a fundamental defect which inherently results in a complete miscarriage of

justice," or "an omission inconsistent with the rudimentary demands of fair procedure.");  *Cuoco*

*v. United States*, 208 F.3d 27, 29 (2d Cir. 2000) (quoting *Hill*, 368 U.S. at 428); *Wright v. United*

*States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (dismissal is available where a prosecutor has "an axe

to grind against the defendant, as distinguished from the appropriate interest that members of

society have in bringing a defendant to justice with respect to the crime with which he is charged

. . . .  'the practical impossibility of establishing that the conflict has worked to defendant's

disadvantage dictates the adoption of standards under which a reasonable potential for prejudice

will suffice.'" (quoting *People v. Zimmer*, 51 N.Y.2d 390, 395 (1980).  Alternatively, the Court

should vacate Bishop Whitehead's conviction.

G.      *Bishop Whitehead Should Be Granted Bail*

On September 18, 2024, the Second Circuit denied Bishop Whitehead's application for bail pending appeal.  Second Circuit Dkt. 34.  Bail should now be granted on either or both of two bases: (1) on a renewed application for bail pending appeal for the reasons stated herein (supplementing Bishop Whitehead's earlier submissions on bail), now satisfying the standard of *United States v. Randell*, 761 F.2d at 126; and/or (2) on a new application for bail attendant this application.  Bail may be granted to a defendant awaiting decision on a pending petition pursuant to 28 U.S.C. § 2255 [and coram nobis] where the petition raises a substantial claim and an extraordinary circumstance that "make the grant of bail necessary to make the habeas relief effective."  *See Illarramendi v. United States*, 906 F.3d 268, 271 (2d Cir. 2018) (citing *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2010).  So here.

Dated:  August 27, 2025

                                                            */s/ Andrew J. Frisch*
                                                            Cuti Frisch PLLC
                                                            40 Fulton Street, 17th Floor
                                                            New York, New York 10038
                                                            (212) 285-8000
                                                            *afrisch@cutifrisch.com*